Thank you, Your Honors, and may it please the Court, my name is Stephen Walters. I represent Benton County PUD and the other public entities and cooperatives that are known in this case as the Slice Customers. We have an allocation agreement with counsel for the other petitioner, NW Requirements Utilities, that we will have 15 minutes of argument time and that she will take 5 minutes. And you're not serving any for rebuttal? If I have some left, I would like to reserve it for rebuttal, Your Honor. I'm hoping for about 2 minutes, but we'll see. Your Honors, this case is not like the last case that you heard or the case that you heard on Monday. This is a case having to do with the performance of a contract, a billing dispute as to how much is owed by my client's Slice Customers. As the Court is aware from the briefs, we purchased power from the Bonneville Power Administration under an arrangement called a slice of the system. We don't buy a particular amount of power under this arrangement. We get a certain percentage of the output of certain federal generating facilities that they are hydro plants and other facilities. The amount can go up and down over time. We pay for this power through charges based on the actual costs of Bonneville Power Administration's power business line. The amount that we pay and the provisions for reconciling the amounts we have paid to the amounts we owe at the end of the year are set out in a detailed contract. And the dispute here has to do with that reconciliation. It's called a true-up. For the first year of the contract, the year that ended in 2002, September 30, 2002, there is a second dispute pending in this Court for 2003. The parties have agreed to withhold litigation of the 2004 dispute, but we're coming on 2005. But under the ---- Does Bonneville ever do anything and not get sued for it? I couldn't tell you, Your Honor. I think you ought to ask the President. You can't think of an example where they've not been sued? Okay. But the procedure under which my clients are billed at the end of each year, this reconciliation or true-up, is detailed in the contract. And we have discussed those provisions in our brief, but probably the best summary of those procedures, the true-up procedure, is provided by Bonneville's own documents, which it presented to the Slice customers about 45 days before we got the bill that triggered this dispute. And this is a document that's in the record. This chart is at ER 1461. And in presenting the amount of the ---- that they estimated the bill was going to be, they estimated here it was about going to be $55 million. It turned out to be about $50 million. They said that when you get this bill, the Slice purchasers can challenge, that the Slice purchasers can audit the Slice true-up adjustment charge. That's provided for in the contract. The Slice purchasers can raise issues regarding the Slice true-up adjustment charge. And then here is the key language. The Slice purchasers and BPA must come to agreement on these issues or go to arbitration. And this was the procedure under which we were proceeding. We got the bill in January of 2003. We initiated the audit that was performed by KPMG. And the scope of that audit, as provided in the contract, was whether or not the charges in the contract or in the bill that we got were conformed to the provisions of the agreement. That was the scope of the audit. That was what the audit did. And the result of the audit was that KPMG opined that we had been actually overcharged by $33 million rather than undercharged by $50 million, resulting in an $84 million swing in our favor under that audit. We had discussions with the Bonneville Power Administration about that, the period of negotiation. The parties did not come to a mutual agreement, which the contract says is the purpose of the negotiation procedures. And then the Slice customers filed a notice of arbitration, just as Bonneville said that they were entitled to do. This is the point at which we got off track. About two weeks after the notice of arbitration was served, Bonneville came out with a document that it called a response to our audit. And it went through each item and said, we don't agree with it. There were two items that they said they do. One of them were our audit found that they had undercharged us. The other being an item that is the argument being made by the Council for Northwest Requirement Utilities, but rejected all of the bigger items and said, and this is a final decision under the Northwest Power Act. Well, that's why we're here, Your Honor. This is not a case in which it was ever contemplated there would be a final decision or final action by Bonneville Power Administration regarding this dispute. The agreement, the terms of the contract, the documents that we have cited in our brief, before the description of the entry into the contracts, and Bonneville's own description to us immediately before sending this bill, were that these are not Northwest Power Act disputes. These are disputes regarding bills that are going to come out on an annual basis for the next ten years, and we're going to resolve them quickly and efficiently in arbitration. The – our clients, the Northwest Requirement Utilities, filed a petition for review. We filed what we called a precautionary petition for review, because we don't think that this Court has jurisdiction of this dispute. It is our contention, and the issue that I would like to focus on in my remark. There are others addressed in the briefs. Of course, I will answer any questions the panel has. But we think that the dispositive issue here is that this Court lacks jurisdiction over this contract-based dispute, and that it should be resolved, as the parties agreed from the outset, in an arbitration proceeding. The – we think, obviously, that is not only dispositive of this case, but we think it is an important issue for this Court to clarify its case law on what is a – in this case, the dispute, is this a rate case decision or a rate case implementation decision on the one hand, or is it, as we believe it is, a contract performance, a billing dispute on the other hand? If it's a rate case dispute, does that mean that it would then not be subject to arbitration? Yes, Your Honor, under the terms of the contract. This Court's decision in Kaiser Aluminum suggests or could be read to say that anything within this Court's jurisdiction cannot be arbitrated. I don't think it can be read – it should be read that broadly, but that's not an issue here because the contract says if it is subject to your jurisdiction, it's not going to be arbitrated. But what we do know is that the parties clearly agreed that these disputes would be subject to arbitration, that they weren't within the Court's jurisdiction. So you agree that even if they clearly agreed that it would be subject, it won't be? If you decide that you have jurisdiction. If we have jurisdiction. Yes, given the language of this contract, Your Honor. We think that this jurisdictional issue is critical, obviously, not only to my clients, who believe they had bargained for a dispute resolution proceeding that was offered by BPA and entered into voluntarily, but it is also important to clarify what are contract disputes and what are rate case implementation disputes. Clarification may not be possible. That is to say, we've got a fair number of cases already in this area. One more, well, okay, one more case. But the clarification may be beyond our scope. I understand it's difficult, Your Honor. But I would, with picking my words carefully, I would characterize this Court's previous decisions in this area as I know it when I see it. And I would respectfully suggest that I think that the Court can do better. We have proposed an approach where a rate case dispute, a final action that is a rate determination under Section 839e of the Act, which is what the statute says is a final action subject of this Court's review, is the sort of dispute you just heard. There is a rate case dispute. There are arguments about whether Bonneville acted arbitrarily or capriciously or acted in violation of law, and that those are rate case determinations. We believe that a rate case implementation dispute is one which involves a decision by Bonneville Power Administration that a particular rate that it applied, that it to a particular transaction. And we would give to you the Kaiser Aluminum case again as a classic example of that sort of decision. In that case, although the parties said, well, we think it's a contract dispute, they actually came to this Court and were arguing over Bonneville's decision that a certain sale of power was subject to one rate and not the other, one rate schedule and not the other rate schedule. That is a classic implementation of a rate case determination. But when you get into this area, when you have what we believe are properly contract performance issues where the procedures for resolving dispute and, in fact, the parameters of the dispute itself have been carefully negotiated and set out in a contract, that that is something that should be resolved in court of Federal claims if we were having to sue Bonneville for this overcharge or if we, as the parties agreed here, in arbitration. And what that will do is it will mean that parties have some clarity and we don't have to keep filing petitions for review in this Court and asking you to dismiss them because we will not, it will at least be a step toward helping parties to know what is and is not subject to this Court's jurisdiction. And we have gone through the cases in our brief to show how this template, if you will, would fit into this Court's prior jurisprudence. We think it's entirely consistent. Counsel, is it your position that BPA announced, BPA came out with its response to the audit, conceded on a couple of points, disputed the rest, and announced it as a final decision on the basis of rates, as a final rate decision, is that right? Rate or rate implementation. Is it your position that BPA could have done precisely what it did without taking the step of announcing that it was a final decision with respect to rates so that it might have been categorized as something else that might still have been taken to arbitration? In other words, is it possible for BPA to come out and say, look, we've examined all of these claims and we dispute what KPMG says and put it out there and still allow it to go to arbitration? Absolutely, Your Honor, because it's a matter of, again, the notion was that there wouldn't be any final action by Bonneville at all. The real problem is not the fact that the BPA, from your perspective, the real problem is not that BPA disagreed with you. You already knew that. It was that it announced it as something in order to force it in a particular direction. Absolutely correct, Your Honor. An ad hoc final decision that was not contemplated, that was not provided for, that didn't have an administrative proceeding where we were allowed to make a record as to what we thought the proper interpretation was, what we thought the proper auditing standards were. Was it issued as an ROD? No. It was issued as simply a document that says response to audit. And did it say final decision? What did it say on it? It said it was a final decision. At the end of it, it said this is a final decision. But, again, it came out of the blue and out of the air. There was nothing that provided for it. By announcing it as a final decision, they simply ran around the arbitration provision. Correct, Your Honor. That is – I need to cede the time to my colleague. Thank you, Your Honor. Thank you, Justice. How does that mic work for you? Sound okay for you? Can you hear me, Your Honors? Just speak up. Okay. No. All right. Okay. There you go. I'm tempted to make a short joke, but I won't. Good morning, Your Honors. My name is Susan Ackerman. I'm attorney for Petitioner Northwest Requirements Utilities in this case. You know, like the slice customers, Northwest Requirements Utilities are preference customers of Bonneville. They have that preference and priority in statutory rights to an economical supply of power, too. They also have procedural rights under the Northwest Power Act regarding Bonneville's rate making. Both of those statutory rights are at issue in this case for us today, and that's why I'm here. I, too, am going to concentrate on the jurisdictional issue because it's important to my clients. The slice customer view in this case, as you just heard, is that this is really a contractual dispute. They think that it should be resolved in a private arbitration. Now, under that theory, and prior to the time that NRU filed its petition in this case, BPA and the slice customers were headed off to an arbitration of this matter. It's an $84 million rate dispute, and we have been told by Bonneville that we have no right of participation in that arbitration whatsoever. So even though the slice customer view of this case is that it lacks jurisdiction, it's contractual, I think if I could make one point to you today, and I actually see that I'm running out of time already, I would make this point. The court's finding of jurisdiction here is incredibly important to my clients because this court provides the public forum that we need to have input and have these issues fleshed out, and that's why we're here today. In short, we cannot protect our economic interests to an economical supply of Bonneville power if we don't have a public forum where we can resolve those issues. Your position, then, is in opposition to Mr. Walters' position? You don't want this to go to arbitration because that's not a public forum? That's correct. On the jurisdictional issue, we believe that this court has jurisdiction. Help me understand. I understand why you want this, just as I understand why Mr. Walters wants what he wants. That is, he wants to get out from under all the presumptions that go with an administrative decision and just have it be an ordinary contract dispute where some of those things disappear. I don't understand the why. Help me with the doctrine that gets you to the position where you are. I mean, why is this not an ordinary contract dispute? Why is this a standard ratemaking proceeding such that we have jurisdiction? Your Honor, I think the facts and the law in this circuit are extremely compelling on the issue of jurisdiction. I know Mr. Walters thinks it's not clear and needs some clarification. I think it's utterly clear. The facts of this case are so clear. Well, when it's utterly clear, you don't want another decision out of us, then. We'll just mess it up. Okay. Well, Your Honor, the slice rate, the slice rate methodology works side in that very same rate case you've been hearing about all morning. It's a formula rate that adjusts these rates every year according to the formula. The rate was resolved in a rate case. It was later embedded in the contract. It's that contract that the slice clusters believe converts this into a contractual matter, not a rate matter. But, you know, you've had 20 years of case law in this circuit, Your Honors, regarding questions exactly like this. Under similar circumstances, plaintiffs have raised these questions and the court has consistently said no. Embedding a rate in a contract does not convert a rate into a contractual matter. You've actually got, that's the Central Electric case. These are all cited in my briefs at pages 10 to 13. There's the Association of Public Agency Customers test, which tells you how to distinguish between rate matters and contractual matters. If a contract term actually affects the monetary price of power, then this court has said it's a rate matter, not a contract matter. You have the Puget Sound Energy case, which I think is dead spot on with this case, and that is a case that says if you've embedded a rate true up mechanism in a contract, it's a rate implementation matter. That case is cited in my brief, too. And finally, of course, there's the Kaiser case that says if it's a rate matter and subject to this court's exclusive jurisdiction, it can't be arbitrated. So I see the situation very differently than Mr. Walters. May it please the court. My name is David Adler, representing the respondent, Bonneville Power Administration. As you've heard, the slice of customers are arguing that they have the right to arbitrate Bonneville's implementation of the slice true up adjustment charge and contend that this right exists under the terms of the contract as well as the law of this circuit. And what I would like to do is to address both their contractual arguments and their jurisdictional arguments in that order. At the outset, it's important to respond to the notion that Bonneville is seeking to circumvent the rights under the slice under the slice contract. This Court has always interpreted this case as a case of arbitration. Mr. Walters. Mr. Chairman, if we disagree? Yeah, that's correct. There is a dispute resolution provision. What that provision starts out with in section 4A says this, and I quote, final actions subject to section 90 of the Northwest Power Act are not subject to binding arbitration. Okay. But I'm having specific disputes over amounts. Your opponent said you were negotiating these disputes, you had a disagreement, and you sent him a letter, if we can't agree on it, then we'll arbitrate them. Did you do that? Well, what we have in the contract, Your Honor, does not say that we are going to subject these disputes to arbitration. In fact, it says there's actually no provision in the contract that says so. But I asked whether you sent him a letter that said you were going to do that. Well, what I think, what I believe Mr. Walters was pointing to was a document in one session that Bonneville had with some of the slice customers, and I'm sure there were many, many sessions, and it may be that one of these pieces of paper said something about having arbitration. There's also another. I don't know whether you sent him the letter that he referred to or not. I think, Your Honor, I think we showed in our brief as well that that same document in another portion said it would be subject to arbitration or litigation pursuant to section 14 of the contract. And that's what I would like to get to if I possibly could, because the point here is that section 14 of the contract is really what starts setting out how the arbitration or litigation provisions work. First, we said we would finally recognize this Court has exclusive jurisdiction over Bonneville with respect to certain final actions, and therefore, those final actions could not be subject to arbitration. Then it says contract issues or contract disputes arising under the terms out of the contract are subject to arbitration. Now, section 4B6D of the slice contract pertains to the true-up. And that says that disputes over the true-up shall be resolved by arbitration or litigation pursuant to section 14. Numerous other sections of section 4B6D of the true-up are in accord and also say disputes under that section will be resolved pursuant to section 14, that is, by arbitration or litigation. There's not a single passage in the slice contract that says true-up disputes are subject to arbitration alone. Instead, the parties left the issue of whether true-up disputes are arbitrable or whether they are subject to this Court's jurisdiction unresolved and simply agreed to follow the general directives of section 14. So if it's a final action in the scope of this Court's jurisdiction, that's where we are. And if it's not, then we're subject to arbitration. Now, the question then is, okay, what makes this a rate determination within the scope of this Court's jurisdiction? And I think this Court has given us a lot of guidance going back about at least 15 years. And we've cited a lot of those cases in our brief. And this Court has developed the true-nature test. And that is to get beyond the parties' characterizations of the claims and instead go to the real core, the real true nature of the dispute to determine whether it's a challenge to a rate or whether it's a challenge to a contract. Now, in the instant case, we believe, of course, what is really being challenged here is the amount the slice customers are being charged for the sale of electric power under the slice rate. And the slice rate, as well as the true-up charge and the slice rate methodology and everything that goes that it incorporates, was developed in Bonneville's 7i rate proceeding. And the slice customers themselves were very explicit in testifying that the slice rate includes two components. One is a monthly charge based on forecasted costs, and one is the true-up adjustment charge. And I'll actually quote from the slice customers in their testimony in the Bonneville rate case. Quote, there are two parts to the payment. First, slice purchasers will pay a slice rate monthly based on forecasted costs. Second, slice purchasers will pay or receive a slice true-up annually based on differences between BPA's forecast and actual costs. The result is that the true-up is an integral, essential part of the rate. And the slice true-up adjustment charge, as well as the slice rate methodology, were all taken from the rate proceeding and incorporated verbatim into the slice contract. Section 18 of the contract says that the slice rate methodology and the slice rate as approved by FERC, which all includes the slice true-up adjustment charge, are incorporated into this agreement as it fully set out in the body of the agreement. As Ms. Ackerman was just referencing, the fact that a rate is incorporated into a contract doesn't change its essential character from still being a rate. And for that reason, we believe that is why we are dealing here front and center with a rate dispute, not a contract dispute. This Court has actually has quite a bit of precedent that we believe is very applicable and actually dispositive of this particular issue. And one of the most recent line of cases the Court has addressed includes Puget Sound Energy, MSR, Transmission Agency of Northern California. And in Puget, under facts remarkably similar to this particular case, this Court held that a true-up charge at issue in that case involved the implementation of a rate subject to this Court's exclusive jurisdiction. And as in the incident case, the rate had been incorporated into a contract. It was subjected to an audit. The Petitioner had a right to arbitration. It was nonbinding. And Bonneville's final true-up determination was found to be the final action for purposes of judicial review. I'd also note that, too, there was a comment made about Bonneville stamping something as a final action and what impact that had on it being a final action. In the Puget case, Bonneville sent a letter to the Puget in that particular instance. And in that letter, Bonneville didn't say that was the final action, but rather it was Bonneville's final determination, a culmination of the process. It said, here's our final resolution of this. This Court said that was the final action. It wasn't the words Bonneville saying this is or is not a final action that made it so. It was rather the fact that that was the culmination of the process. And so we think that is equally applicable in this case. In MSR, this Court also explained the challenges to Bonneville decisions that are within the scope of this Court's exclusive jurisdiction will not lose their – will not deprive this Court of its jurisdiction just because there may be some contractual aspects. What this Court said is despite contractual aspects, if a case is within the scope of this Court's exclusive jurisdiction, it stays within the scope of this Court's exclusive jurisdiction. And that, again, goes to what the core of the dispute is. What is the true nature of it? The true nature of the overall dispute is within the scope of this Court's jurisdiction. It will have that regardless of whether there may be some contractual overtones and undertones. And I'll just make one more point, Your Honors, because I'm sure everybody is ready at this point for lunch and a break from Bonneville. But that point is this. I just mentioned to the Court, we can go back to 1987. There's the case of City of Seattle v. Bonneville. There's the case of Atlantic Richfield v. Bonneville. There's the case of CP National v. Bonneville. It's generally the same issue. Was that a rate or was it a contract? And the Court resolved that issue with fairly straightforward language. We bring it all the way up to 2003 with the Puget case, MSR, Kaiser, Transmission Agency in Northern California. All those cases have ways of addressing this kind of issue. So I think this Court actually has provided a very clear and a very consistent body of law, and the true nature test is the definitive test. If this Court has no further questions. Thank you, counsel. Thank you, Your Honors. May it please the Court. The Bonneville Power Administration not only told my clients immediately before they sent that bill that this dispute was subject to arbitration. They did it in the product description, ER-409, where they said that if you select arbitration, and we were given an option and we selected arbitration, if you select arbitration, it will be limited to matters such as the true-up charges. They said that twice. They also said that in an earlier product description at ER-248. Where do you think that gets you? If the law is in the circuit, let's assume for the moment that the true-up charges would be ratings making rather than contracts, and that under the law of the circuit, we would have jurisdiction over that dispute in the absence of those letters and representations, and that notwithstanding what the law would otherwise be, Bonneville sent you letters, made statements that they were willing to arbitrate. Where does that leave you? Your Honor, if this Court were to conclude that Bonneville just made a mistake the many times it said it before rather than it made a mistake when it, out of the blue, issued this ad hoc paper that it called a final decision with no administrative proceeding, no ability for us to make a record, then if they were mistaken before it wouldn't get us anywhere. But I think it is very, very relevant to this issue that Mr. Adler was referring to regarding the true nature of this dispute and the party's views of the true nature of this dispute before we were claiming money back. I'm trying to ask Judge Reinhart's question in a different way. Assume for purposes of the question that absent the arbitration agreement, absent the letters and so on, if we just look at the nature of this dispute, assume that we would find that this is a rate dispute, not a contract dispute, and that we have jurisdiction. The contract appears to incorporate into that contract that line. And if we have jurisdiction, we don't arbitrate. Yes. It sounds to me as though your argument is that these later letters have modified the contract. Is that true? No, Your Honor. I was not arguing that they modified the contract. The answer to that question is that if you find that you have jurisdiction, then you do and we don't arbitrate. And those letters make no difference to that? Those letters make no difference, but we do believe that they are highly relevant to the court's view of the true nature of this dispute. And just a couple other quick points, Your Honors. We are not attacking any decision made in a rate case. We are not attacking the decision that this rate and this methodology apply. We are attacking accounting matters, and we are attacking issues that we are allowed to attack by contract, the audit provision that says we get to audit and dispute costs that are not allowed for under the agreement. So we are not attacking any of those other decisions. And as for the cases that were cited, we discussed the Puget Sound case at length at pages 21 to 24 of our opening brief. We discussed MSR and the other cases and why they support our view of where this court's jurisdiction lies, I believe, at pages 25 and 26 of our opening brief. Thank you very much. Thank you, counsel. Thank you both very much. The case to be argued will be submitted. The court will stand in recess for the day. All rise. This court for this session stands in recess.
judges: Reinhardt, W. Fletcher, Bybee